May it please the Court, Tom Sondag on behalf of the Appellant Northwest Bank. There are two fundamental issues presented on this appeal. The first is whether the bank had a secured interest in the seed that's at issue, and the second has to do with if it did have an interest, whether there are other interests that have priority over the banks. I'd like to start with that first question, but I want to make a note right now that when I get to the second, I'm going to need to correct a point we make regarding the agricultural service lien later in our brief. So as a first issue, we had two alternative arguments as to why the district court was wrong in concluding that the bank lacked a security interest in the seed. I think in my time today, I'd like to focus on the first of those arguments. It's short. It's simple. And I think it's correct, and I hope the Court agrees with me on that. There's no dispute here that the bank had a duly perfected security interest in all of CCS's assets, including its goods. And there's no dispute but that under the UCC, a seed is a good. Okay? Where the district court got off and got tripped up was in the question of whether CCS had rights in the seed when it granted the bank a secured interest in its asset, including its goods. And to that we say absolutely. CCS had a right in that seed. It owned the seed. Even if it hadn't. Go ahead. Are you talking about the seed stock or the crop? Stock, crop, any aspect of the seed. Okay. Then in that case, I need help with the Larry Berger contract. I think there were 14 seed grower contracts, but we have two. Correct. One of them we have is the Larry Berger contract, and that was executed before the bank's security interest. It was executed in the last signature. It was February 2014? Correct. The bank's security agreement is July of 2014. Okay? And on page two of this document, let's go to page one, which is NWP 388. Paragraph two seems to indicate, well it states, CCS will provide a reasonable amount of seed stock at no charge to the grower, and by doing so does in no way convey any ownership of the seed to the grower. Right. Page two, though, under the paragraph titled Production Contract Additional Terms and Conditions, that second paragraph says the grower warrants that all seed shall be delivered and sold to cover crop solutions free and clear of all encumbrances, which seems to indicate that the grower was, that CCS did not retain ownership of the crop. A couple of things regarding that contract. There were two types of seed at issue here. Right. This is the rye seed. This is the, this is not the radish seed, which is what virtually all of the argument was about below. This is the ryegrass seed. When I got involved with this case, I said, what about this ryegrass seed? There's no, there's no, there's really very little evidence on this. We would submit that the ryegrass seed as well, though, on the terms of it, are indeed in the same fashion ensure that the CCS does have ownership of the seed. I think you'll find in both of these contracts, you will see that reference occasionally. I just, I think they're sloppy. They speak of the idea of paying for the seed. And it's clear that what is going on in these contracts, they are paying for the services that the farmers perform. So can I put it back up? There's 14 of these. Your briefing treats them all as though they're all the same. And on our record, we only have two. We have one that I just mentioned, the Berger contract, and then we have the Van Dyck contract, which is about radishes. Correct. And so I just need to know, how representative is the Berger contract? To my knowledge, I think all of these contracts were the same. We tried to just give the Court one of each. They're not. Van Dyck is very, very clear, the case that CCS retains ownership of the seed stock and the crop. Correct. And I think that the Berger contract is not. I just read it to you. Okay. And that's my problem. And I think I'll address that in rebuttal. I want to pull out the language that I think is in there that I think supports this conclusion. Because it existed, just to close this and then I'll let you go on with your argument, but it existed at the time the bank loaned the money. The Van Dyck contract did not. It's dated later. So hence, to me, it's very important. Yes. Well, these written contracts were executed. It's clear in the record that there were oral contracts. Yes, but I'm talking about the written contracts. And your rank security agreement is sandwiched between these two written contracts. Correct. But there were oral agreements before that. And no one has contested the Grover and the growers have not contested that there was not already an agreement or that the fact that there were oral agreements raises any issue here. I'm not talking about the oral agreements. I agree with you. Okay. Then I'm sorry. Okay. So the problem is that the Ryegrass seed contract at page 389 indicates that the Grover was going to be selling the crop back to CCS, indicating to me that CCS did not retain title. And that's a problem for you because you want a security interest in their goods. And I will agree with that. And I will apologize to the Court. The Ryegrass was like sort of a sideshow. There's very little evidence about it. And I submit you've raised a good point, and I'll address that. Okay. That's fine. Just so you know, we only have these two contracts out of the 14. So, okay. I appreciate that. There's no claim here by the growers that they own the seed. It's just that they want their liens to be asserted against it, right? Which is exactly what the law provides, frankly. But they disputed that CCS owned the seed. And that's why, as I say, the district court made a mistake. CCS clearly owned the seed. And if you go back to the 2011 licensing agreement, which deals with the radish seed, that that... Who did the growers claim owned the seeds? Who did the growers claim owned the seeds? You know, I think you should ask the growers that. I think it's an interesting question, Your Honor. The licensing agreement, in the licensing agreement with Blue Moon, CCS promised that it wouldn't convey, right? Correct. The seed stock or the crop. Hence my problem with the Larry Berger contract that I've already raised. But I think that's your point. Isn't your first argument going to pertain to the licensing agreement? The first point... The first point of the licensing agreement, indeed, CCS was prohibited from giving title to the growers. And so I think you should stop right there. Who owns the seed? CCS. No, that doesn't mean they didn't do it. That means they promised Blue Moon they wouldn't. True. And when we get to the production contracts involving the radish seed, it all confirms that. It amplifies the point that CCS owns the seed. It owns the stock. It owns the seed when it's in the ground. It owns the seeds as produced from the stock. It owns it when it's harvested. It owns the seed. There's no dispute about that. The radish seed that I just mentioned earlier that is in the record, the radish seed contract... Correct. ...is clear on that point. That's my read on it anyway. And so maybe, Your Honor, if you could just... I just need to know if it is identical to all of the other radish seed contracts. Okay. Come back to that. That's my problem. I believe it is. And we have cited to a number of the other radish seeds that were in the clerk's record. This is interesting. I like to give the Court a good record, but I also don't like to give them an excerpt that's like this. So I did try to just limit it to what I believe were exemplar contracts for both of those types. How do you think the district court was wrong in his interpretation of the licensing agreement? How do I think the district court was wrong? Well, as I say, the first error was not recognizing that that license agreement gave the CCS the ownership in the seed. And the fact that you don't even need to get into interpreting either those licensing agreements or the production contracts to recognize that CCS owned the seed, and that's therefore, at the time that the CCS granted the bank a security interest, it wasn't your interpretation of the license agreement, because the district court determined that CCS unconditionally assigned its rights in the seed and production contracts to Blue Moon, and I think your argument is that until there was a default, that assignment didn't take effect. So why was the district court wrong in saying that the unconditional assignment took effect right away with the effectuation of the license agreement? The district court was wrong on that, but I do want to step back and say that the ownership of the seed would exist regardless. And I think that when you look at the... Regardless of the license agreement? Even in light of the license agreement and in light of what they, the assignment provision that they described, because that assignment, it's clear, was nothing but an, if it was hereby assigned, then what was assigned? What was assigned was a security interest. It was not an assignment of all rights under the licensing agreement, if we've shown that. What was it, what was the purpose of that? It was to secure Blue Moon with respect to a debt owed to it by CCS. That is a security interest. And there's, it's clear under the case law, some cases call that a conditional assignment. And it was conditional on what? Default. Right? And Blue Moon is not in this case, and its only interest is to get a royalty payment when the seeds, I guess, are sold. Correct. That's all their interest is, the net parties to this litigation at all. Correct. And that's the additional point about that assignment provision, which is like, look, once we get our royalty, CCS gets the remainder, which again shows that it's not a complete assignment. It's simply a conditional assignment or, in fact, an assignment of a security interest. And so the district court was mistaken in that respect as well. The other, so we believe the Court was simply wrong on its conclusion that the bank did not have a security interest in the seed, and we believe that the Court should reverse. And now I'd like to turn, if I could. Forgive me. So the bank concluded that you didn't have a security interest because as of the time the security agreement was executed, the seed or seed crop wasn't a good of CCS, yes? Are you saying is that what the district court found? I'm sorry. I didn't hear you correctly. I think I answered my own question. I'm using up your time. Go ahead. No, okay. I wanted to turn to the priority liens, and I wanted to turn to the agricultural services lien. Did the district court address the priority of the liens? It addressed the priority of the liens with respect to some of the growers, and I believe that most of those growers that are identified in the judgment are not parties to this appeal. It did not address the liens except in the context of summary judgment, for example, with respect to the growers. Since you mentioned summary judgment, has the bank's position changed between summary judgment and now? The bank's position? No. No, it raised both of those arguments as to why it had a security interest in the seed. If we were to agree with you and reverse, Fadi, that the ownership stayed with CCS throughout, what would the district court have to do on remand to resolve this kind of complex, internecine type of involvement? Yeah, and I think that gets to the question, relates to the question, like, did the court make a finding on these liens? You know, I want to be candid with the court. I think when the court concluded the trial and said, well, the warehouses aren't your agent, therefore you didn't have a lien, I'm not going to get to the priorities. Now, I will say this, that the findings he made at trial, which haven't been challenged, preclude the grower's claim of a grain producer lien, because they need to deliver to a purchaser or the agent of the purchaser, and they themselves proved that the warehouses were not the agent of the purchaser. I think it should happen on remand, if anything. I think that the court will need to enter judgment in accordance with this court's rulings, which I can't tell you. For example, the growers have said, well, we will have a grain producer lien at some point in the future. There's no facts to support that. I think, here's what I think, on the facts that we have, the growers have no possessory lien, and they have no grain producer lien, and I think this Court should say that for the reasons we've argued in our brief. I do want to say something about the agricultural service lien, because I want to correct something in our brief. This involves one party that's not even a party to the appeal. But this is the statute that involves the need to give notice to the party who is duly perfected with the Secretary of State. And the question is, well, who's the Secretary of State? The growers say it must be the Secretary of State of Oregon. We say, well, it must be the Secretary of State of the State in which you have to be. I get that issue. What about these possessory liens? Okay. Tell me about that. Okay. Tell you about the possessory liens? They gave up possession. They gave up possession, and that's the end of that. That's the end of it. That's what the district court held in summary judgment. We have a number of these growers. I mean, they're all over the place that have kept their radish seeds. They have not lost their possessory liens, and some have. If any grower kept possession of their lien, they would have one. They have it. But the growers that are on appeal, the appellees here, were all growers that delivered their seed to the warehouses. That's all we have before us. That's right. We dismissed a number of appellees that did not raise that issue. But your position is that they gave it up when they delivered it to the warehouse. It's as simple as that. Correct. And that's what the district court held, and that was correct. Were you going to make a correction about the agribusiness? I was going to make a correction. Press on. It has to do with legislative history. All right. So in 2001, the UCC changed. Before 2001, you duly perfected an interest where the collateral was located. With crops, that would have been Oregon, right? In 2001, it changed. You duly perfected where the debtor was located. That's why we filed in Pennsylvania. The agricultural service lien never changed after that. So we have this agricultural service lien that speaks of a Secretary of State. Before 2001, it probably made sense that it would be the Secretary of State of Oregon, and I want to be candid with the court about that. I think that our arguments, however, that we've made in our brief, continue to apply and support the conclusion that what the legislature intended was that all duly perfected secured parties would receive notice. All right, counsel. You've exceeded your time. We'll give you one minute for rebuttal. Thank you. May it please the Court. Counsel, I'm Paul Conable here on behalf of Defendant Appellees. Before I maybe embark on my presentation, there are a few questions and points raised for Mr. Sontag's argument that I'd like to address. First, it does matter, the difference between the oral and written contracts, and we made that point in the brief. One of the instances of default that occurred in this case is the default of not obtaining a written contract from each of the growers before allowing the 2014 stock to be grown. That's something we briefed, but it's a requirement under the licensing agreement between Blue Moon and CCS. There aren't 14 of these contracts. There's more than 40 of them. But why do I think there's 14? Are there 14? I have 14 from the briefing. What's the subset of 14? You know, Your Honor, I'm frankly not sure. But each of these, there are more than 40 growers involved in these cases, and each of them has a separate. Please don't tell me there's 14 different forms of the grower contract. There are not. Your Honor, here's some good news. There are not 14 different forms of the grower contract. They're substantially identical with respect to the radish seed contracts. Well, what about the Larry Berger contract? That's, so far as I'm aware, that's the only one of the annual ryegrass seed contracts that was in the trial court record. So those are obviously distinct from one another. Okay. So out of what I thought was 14, but anyway, out of the universe we're talking about, you think there's only one ryegrass contract that's got this provision where the grower is selling the seed crop back to the CCS? I'm only aware of one in the record, Your Honor. It's been a while since I looked at that. But with respect to the radish seed contracts and the Van Dyck Farm contract as an example of that, those are substantially identical. Interestingly, Your Honor pointed out the effective date of that agreement and noted that it falls after the bank's security agreement. It also falls after the default of CCS under the Blue Moon agreement. The signature date on those contracts, Mr. Van Dyck's contract, is February 9th of 2015. The notice of default here, wherein CCS was defaulted by Blue Moon under its licensing agreement, and that's SER1. Okay. I was just going to ask you that question. It's SER? It's SER1, and it's January 28th of 2015. So before the contract existed under which they're claiming these rights and which is the basis of their claim, Blue Moon had already defaulted CCS for nonpayment before the effective date of those contracts, before they signed. It seems to suggest that default, you know, by operation of law, then that provision was triggered from the Blue Moon contract. Your Honor, the contract speaks in terms of default and termination as being two separate things. Well, because there's a promise. It's hereby assigned, and then there's a promise by Blue Moon that it will not use. Correct. Right? Correct. Until default. And so is Judge Ma. And this license agreement is a license agreement. It's not a UCC financing statement. It's not a security agreement. It says it's a licensing agreement. It grants a license. It purports to be a licensing agreement. It's a patented seed. It has nothing to do with a securitization. There was no loan between CCS and Blue Moon. So you think it was all simultaneous in the way the district court described it, hereby assigned? Yes. Yes, Your Honor. And the reason for that is it — the reason for that is that because this is patented seed, the thing that the license holder or the — I can never remember my O's and E's, but Blue Moon. The thing that Blue Moon has to be careful of, and this is why there's a non-assignment provision in here, this is why there's a bankruptcy provision in here, is that this patented seed is always under control of someone who is controlled by Blue Moon. So that Blue Moon always has contractual privity with somebody and can ensure that this seed is either sold pursuant to a contract that protects Blue Moon's rights under the Plant Variety Protection Act or it's destroyed. That's why Blue Moon has rights assigned to it as a third-party beneficiary under the CCS contract. So, yes, that's — and the reason for that is you have — it's like agreeing to a judgment with a covenant not to execute. It's so that in the event that CCS goes bankrupt, as they did in this case, Blue Moon doesn't have to go to court and establish that it owns this seed. There is no moment when this seed isn't under Blue Moon's control, even if it's in the hands of the courts. I don't get that. It's your position that Blue Moon has the ownership of the seeds or the product or the whatever? Is that your position? Your Honor, if you were to look at the license agreement at ER-64. The license agreement just says we want royalties upon the sale of this. License agreement, respectfully, Your Honor. Blue Moon Farms is the owner and has the exclusive worldwide rights to a variety of forage radish. That's at paragraph A. Licensor hereby grants to CCS marketing and production rights a license. Paragraph 6, on the second page, the parties agree that the variety shall at all times remain the party of the licensor. How does CCS get seed? Paragraph 5, seed stock. CCS agrees to pay licensor a mutually agreed upon amount of dollars. It's the royalties. So Blue Moon owns the seed. Blue Moon owns the variety. I'm not so sure I agree with that. Well, and then, but as between Blue, or excuse me, as between CCS and the growers, CCS owns the seed. CCS owns the seeds. As between CCS and the growers. So if there's a claim when CCS gets seed stock and hands it over to the growers So I'm confused. You're telling me that they own it to some extent, but to other extents they don't have ownership? I don't understand that. They own it or they do not own it. It seems to me that as a matter of law, they own all of this. I don't understand how you can contend otherwise. I can contend otherwise, Your Honor, because the licensing agreement between Blue Moon and CCS. They just want royalties. That's all they want. Blue Moon is not a party to CCS. Your Honor, respectfully, it's not all they want. What they want is to have control of their But how does that affect the interests of the growers? You're talking about Blue Moon owning it, right? And then you say that it's not so when it comes to the growers, vis-à-vis the growers CCS owns it. That's a little bit confusing to me. The growers are sub-licensees of CCS. As between the growers and CCS, CCS owns the seed. But CCS has assigned all its rights under the grower contracts to Blue Moon. When Blue Moon defaults. You mean CCS defaults? Excuse me. When CCS defaults. I didn't know we're listening. Blue Moon has these rights in the seed anyway. It agrees not to execute them. Right there, do you mean seed stock or do you mean the crop? Both. All the seed. And it agrees not to execute on those rights. It agrees not to execute on the rights unless and until there's a default. When there's a default, then, they're concerned about their royalties. What happens is the growers step into the shoes of CCS to the extent that they then have the responsibility for selling the seed and paying the royalty, which is what occurred here. So you say that that licensing agreement constitutes CCS giving up its ownership to the seeds and everything that flows from the seeds upon their default. CCS, any rights that CCS has under its grower contracts or any production contracts, it is unequivocally assigned. But the licensing agreement doesn't involve CCS giving up its rights in the seed. CCS only has a license in the seed as a result of a licensing agreement. Any rights that CCS has in the seed derive in the first instance from the licensing agreement. The whole purpose of a licensing agreement is to give them the opportunity to be the owner of seeds and to pay a royalty when those are sold. It's as simple as that. Well, it's a patented, it's, this is much more akin to a license for intellectual property, because these are patented seeds. And this is, every provision in this contract almost talks about plant variety protection act, and the goal here is to protect their right in the intellectual property that is the patent in the seed. That's what makes the seed valuable. This is patented seed. This is what the PVPA is for. I want to turn, if I may, please, to this, the issue of liens here. I'd like to talk first about the grain producer liens under ORS 87-775. There's a little bit of an Orwellian argument here. Once the, the grain producer liens are a super priority lien. A grain producer lien for 180 days beats anybody. And a grain producer lien is only triggered, you can only, you only have a grain producer lien once you transfer physical possession of the seed to a purchaser or the agent of a purchaser. Based on the trial court's conclusion that the seed cleaners were not agents of the purchaser in this case, that never occurred. At least it never occurred as of the time of trial. So the argument is advanced that because that has never occurred, the bank seeking a declaration that it has a superior lien right in these seeds must necessarily be true because until we give the seeds to the bank as a result of a court order here, our right to have a, to have a lien here doesn't ripen. Of course, it would ripen instantly upon the seeds being passed to the bank. It's, as I said, it's a little bit of a Kafkaesque argument where we can only win by losing. But I would suggest that in looking at that, the court look at the declaration that the bank sought in this case, what the court was actually ruling on. And that's in the excerpts of Record 132. They're seeking a declaration not just that they have a security interest in seeds, but that their security interest is superior and that the super priority lien under R.S. 8775 that the growers would have had has been vacated. That is not a declaration, even if Mr. Sontag is right that, aha, your lien doesn't kick in until we get the seed, and by the time we've got the seed, we've already won the case and we have the seed. Even if that somewhat unattractive argument were legally valid, it wouldn't entitle them to the declaration they seek. There can be no circumstance in this case, since it was determined that the cleaners are not the agents of CCS, there can be no circumstance where we were required to record these liens, or the liens even began to run, until the seed was sold, which it was at the end of 2016, early 2017. That's outside the record, Your Honors, and I'm not — but the seed was sold. There was a moment where these liens came into effect, then the seeds were paid for and the liens were vacated. So to suggest that we could go back for a trial, seeking to answer this sort of metaphysical question of — Sotomayor, are you saying this issue is moot now because the seeds were subsequently sold, everybody was paid appropriately, Blue Moon got its licensing payments? I haven't — we certainly haven't argued that it's moot. I don't understand it to be moot, because I understand that the thing that they're asking for is a determination that, I guess, as of the instant before possession would pass if we won the case, they can't — I don't think it's — they're asking for a declaration here with respect to their — I'm just confused, because you just raised an issue of facts that happened subsequent that could arguably moot these — the issues in this case. I'm a little confused about that. Well, we certainly haven't argued that they moot the issues in the case and the seed has been sold. That's not in the record in this case. It's a perishable agricultural product. I mean, it can't — It's been sold, everybody's been properly paid, so why are we litigating this then? Well, we're not the appellant here. And though the seed has been purchased and was paid for, the farmers who raised this seed on their own dime haven't come close to being made whole for this. Let's not suggest that — I mean, they've paid over $6 million to grow this seed for CCS, didn't get paid for it, sold it two years later after being delayed by this litigation at bargain basement prices. So, no, they haven't been properly paid in that sense. There's also the issue of possessory liens and the suggestion that we have somehow — that we have somehow lost a sign error on the issue of possessory liens. This is based on — they've quoted to you excerpts of record 131 to 133, which is a part of an oral argument where Judge Mossman is asking me questions about our claims for possessory liens and doesn't seem very impressed with my arguments. They're connected to pages 134 to 140 of the excerpts of record, which are also in front of you, Your Honors, where this argument continues. Judge Mossman does not make a ruling one way or the other. What Judge Mossman says is, as Mr. Sontag said, you have to have an agent — you have to have delivered the seed to your agent in order to keep your possessory lien. What I argued to Judge Mossman was, no, that's not what the case law says. It says your agent or your servant. And certainly in these circumstances, the seed cleaners who we paid, who we directed, who gave us back our seed when we asked for it, are our servants. Judge Mossman then didn't rule on this issue, and if you look at the judgment, there is no ruling that we don't have a possessory lien. We looked at whether we had to cross-assign error in a certain sense. There's no ruling one way or the other. What would we have cross-assigned error to, Your Honor? I mean, that's what we were — so I don't — I believe those arguments are very much still in the case. And I think a fair reading of McGregor and Yellow Manufacturing says that we don't give up our possessory liens when we send our seed out to our servant to be cleaned, pay for it, and then get it back. Thank you. Thank you, counsel. One minute for rebuttal. Where to start? Would you be cognizant to clarify for me something that I'm admittedly confused  about? As I read the record, the growers are not challenging that CCS is the owner of everything here, but your adversary says that ownership is no longer in CCS, it's in Blue Moon. The reason of these contractual agreements, the assignment, et cetera, can you clarify that for me? I disagree. As we explained in our opening brief, there's a distinction between the variety, which is like the patent, and the seed, which is the product. And that agreement makes clear that CCS owned the seed and Blue Moon owned the variety. I want to make some other corrections in the record. The district court issued an opinion on the possessory lien. You'll find it at ER 14. If the seed had been sold, I don't, where this is coming from, what the district court decided on and said and told them and told the growers, they said, okay, if I find that the warehouses are not the agents of CCS, that means you have no grain producers lien, correct? They said, correct, Your Honor. That's at ER 57. The, I also want to clarify the chronology here. The parties entered into oral agreements in spring of 2014. They entered into security agreements in July of 2014. There was a nonpayment in which Blue Moon terminated and reinstated the leases or the agreement in February 5 of 2015. The agreement, the written agreements were executed after that date. There was no breach. The licensing agreement was reinstated. After the nonpayment, it was reinstated, and then the ‑‑ I'm trying to figure out what the it is in your sentence. I'm sorry. January notice of default, and then what is it that was reinstated? The licensing agreement. Pardon me, Your Honor. I always tell my law clerks, it is imprecise. Very good. The license, and there's a lot of it's here. I want to make another. I think it was reinstated prior to the time your client entered into its security agreement. Oh, they had entered into the security agreements long before when the parties had oral agreements. The answer is yes. Yes. And ER 78 to 79, the growers conceived that there were these oral agreements, and the only change in the written agreements was the payment term. They also think those oral agreements put them in default, but the notice of default came later. But I don't want to take up your last statement. There was no notice of default concerning those agreements. Concerning the oral agreements. And, Your Honor, you asked me. I've looked. Those darn ryegrass seeds, as I say. I think I understand your point now. This is poorly written. At the outset of that agreement, it says we're going to give you the seed stock, no charge, and by doing so, we in no way convey any ownership of the seed to the grower. One could interpret that, I suppose, as just referring to that seed stock. It does say seed stock. That's what I read. No, no. It says I'll give you the seed stock, and we're in no way conveying ownership of the seed. It's much clearer in the other contracts. But in the next page. I agree. The next page. It says that all seeds shall be delivered and sold to CCS. That's the problem. I agree. I am willing to fall on my sword with respect to ryegrass, and will adhere to all of the points we've made as to radish seed. All right. Thank you, counsel. Thank you. Thank you to both counsel for your arguments in this complicated case. The case just argued is submitted for decision by the court. That completes our calendar for the day and for the week. We are adjourned. Thank you. Thank you. Thank you.
judges: Rawlinson, Christen, Block